CHAPIN FITZGERALD SULLIVAN & BOTTINI LLP
Edward D. Chapin, Esq. (SBN: 053287)
echapin@cfsblaw.com
Francis A. Bottini, Esq. (SBN: 175783)
fbottini@cfsblaw.com
Jill M. Sullivan, Esq. (SBN: 185757)
jsullivan@cfsblaw.com
Jennifer M. Chapman, Esq. (SBN: 253065)
jchapman@cfsblaw.com
550 West "C" Street, Suite 2000
San Diego, California 92101
Tel: (619) 241-4810
Fax: (619) 955-5318

Attorneys for Plaintiff and the Classes

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION**

| | |
|---|---|
| PAUL PRESTON, on behalf of himself and all others similarly situated, <br><br> Plaintiff <br><br> v. <br><br> FIDELITY NATIONAL FINANCIAL, INC., a Delaware corporation, FIDELITY NATIONAL HOME WARRANTY COMPANY, a California corporation, FIDELITY NATIONAL TITLE INSURANCE COMPANY, a California corporation, LAWYERS TITLE COMPANY, a California corporation, COMMONWEALTH LAND TITLE COMPANY, a California corporation, TICOR TITLE COMPANY OF CALIFORNIA, a California corporation, CHICAGO TITLE COMPANY, a California corporation, <br><br> Defendants | CASE NO. **CV11-09746 DSF (AGRx)** <br><br> CLASS ACTION COMPLAINT FOR: <br><br> (1) VIOLATION OF THE REAL ESTATE SETTLEMENT PROCEDURES ACT, 12 U.S.C. § 2601 et seq. ("RESPA") <br><br> (2) VIOLATION OF BUS. & PROF. CODE § 17200; <br><br> (3) DECLARATORY JUDGMENT UNDER 28 U.S.C. § 2201(a); <br><br> (4) INJUNCTIVE RELIEF <br><br> **JURY TRIAL DEMANDED** <br><br> By Fax |

-1-

CLASS ACTION COMPLAINT

## NATURE OF THE ACTION

1. This is a class action lawsuit against Defendant Fidelity National Financial, Inc. ("FNF") and some of its subsidiaries. During the Class Periods alleged herein, Defendants violated federal and state law by paying commissions and kickbacks to real estate agents in exchange for the agents' referral of real estate settlement services provided by FNF's subsidiaries.

2. Defendants have engaged in the illegal kickback scheme for years, during which time they have actively concealed the kickbacks from consumers and federal and state regulators. The scheme was only recently discovered. In July 2011, the United States Department of Housing and Urban Development announced a settlement agreement with Defendant FNF in which FNF was forced to pay a $4.5 million fine.

3. During the Class Periods, Defendant FNF entered into Application Service Provider Agreements with real estate brokers and agents which provided the agents and brokers access to TransactionPoint, a web-based platform that automates a real estate transaction from listing to closing, and allows the real estate agent or broker to select real estate settlement service providers such as Defendants and their subsidiary companies.

4. The real estate brokers and agents, in turn, entered into Sub-License Agreements with subsidiaries of Defendant FNF, including Defendants Fidelity National Home Warranty Company, Fidelity National Title Insurance Company, and Chicago Title Company, to enable FNF's subsidiaries to be listed in the TransactionPoint software as a provider of real estate settlement services.

5. As part of the Sub-License Agreements, Defendant FNF and/or its subsidiaries, including Defendants Fidelity National Home Warranty Company, Fidelity National Title Insurance Company, and Chicago Title Company, paid the real estate agents and brokers a fee for each referral of the real estate settlement service provided. These payments were not in exchange for settlement services actually

provided and were not nominal payments. In the case of kickbacks in exchange for the referral of home protection contracts[1], for example, the payments averaged approximately one-fifth the premium for such policies.

6.     This class action lawsuit is brought on behalf of two classes.[2] This first class is brought on behalf of a nationwide plaintiff class (the "Class") consisting of all persons and entities in the United States who received any real estate settlement service (including, but not limited to, home protection contracts and title services) from Defendant FNF or any of its subsidiaries in connection with the purchase or sale of a home financed by a federally related mortgage from October 1, 2002 to the present (the "Class Period"), where any portion of the fees or premiums for such settlement services was paid to any real estate broker or agent. Excluded from the Class are Defendants, their parents, subsidiaries, and affiliates, all officers, directors, employees, and agents of the Defendants and their parents, subsidiaries and affiliates, any real estate agent or broker involved in any of the transactions at issue in this complaint, any agent or employee of any federal or state government acting in their official capacity, and co-conspirators.

7.     The second class consists of a plaintiff class (the "Subclass") consisting of all persons and entities who purchased, received, or acquired a home protection contract issued by Defendant Fidelity National Home Warranty Company from November 23, 2007 to the present (the "Subclass Period").

---

[1] "Home protection contracts" are also known as "home warranty plans" and are sometimes referred to as such herein.

[2] This writing/publication is a creative work fully protected by all applicable copyright laws, as well as by misappropriation, trade secret, unfair competition and other applicable laws. The authors of this work have added value to the underlying factual materials herein through one or more of the following: unique and original selection, coordination, expression, arrangement, and classification of the information work. No copyright is claimed in the text of statutes, regulations, and any excerpts from reports quoted within this complaint. Copyright © 2011 by Francis A. Bottini, Jr. and Chapin Fitzgerald Sullivan & Bottini LLP.

8.    As discussed below, Defendants have violated California Insurance Code Section 12760 by paying commissions to real estate agents and brokers in connection with the sale or marketing of home protection contracts.

9.    As discussed below, Defendants have also violated Section 8(a) of RESPA by giving or receiving fees in exchange for the referral of any "service involving a federally related mortgage loan to any person."

## JURISDICTION AND VENUE

10.    Jurisdiction in this Court exists pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. §§ 1332(d), 1453.  Minimal diversity exists because Plaintiff is a California resident and citizen and Defendant FNF is a citizen of Delaware, its state of incorporation.  The amount in controversy exceeds $5,000,000 exclusive of interest and costs.

11.    Jurisdiction also exists under the Real Estate Settlement Procedures Act, 12 U.S.C. § 2601 et seq. ("RESPA").  This case arises in part under the laws of the United States.  Accordingly, federal question jurisdiction exists pursuant to 28 U.S.C. §1331.

12.    Venue is proper in this Court because one or more of the Defendants are located within this District, Plaintiff is a California citizen, his transactions with Defendants were entered into in this District, a substantial portion of the transactions and wrongs complained of herein occurred in this District, and Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

13.    Plaintiff Paul Preston, a California citizen, purchased, received and/or acquired a home protection contract issued by Defendant Fidelity National Home Warranty Company ("FNHW") during the Class Period and in connection with the close of escrow on a residential home at 13640 Lakota Rd., Apple Valley, California 92308 involving a federally related mortgage. The escrow on the transaction closed on

or about March 31, 2011. Upon information and belief, a portion of the fees paid for the real estate settlement services provided by Defendants to Plaintiff were paid by Defendants to real estate agents as kickbacks for the referral of real estate settlement services.   Also, upon information and belief, Defendants and/or their parents and subsidiaries paid real estate agents and/or brokers commissions to persons as an inducement or compensation for the issuance, purchase or acquisition of home protection contracts issued by Defendant FNHW to Plaintiff.   Upon information and belief, the price Defendant FNHW charged for the home protection contract received by Plaintiff was inflated due to the commissions, fees or kickbacks paid by Defendants.

14.    Defendant FNHW is a California corporation with its principal place of business at 1850 Gateway Boulevard, Suite 400, Concord, California 94520.  During the time period covered in this Complaint, FNHW sold home warranty plans in the State of California as well as in Arizona, Nevada, Colorado, Washington, and Oregon. All FNHW's contracts were drafted at FNHW's headquarters in California.  FNHW is part of a larger group of companies ultimately controlled by Defendant FNF.

15.    Defendant FNF is a Delaware corporation with its principal place of business located at 601 Riverside Avenue, Jacksonville, Florida.

16.    Defendant Fidelity National Title Insurance Company is a California corporation with its principal place of business located at 2510 N. Redhill Avenue, Santa Ana, CA 92705.  It is a subsidiary of Defendant FNF.  It provides title insurance policies, escrow services, and other real estate settlement services. Its agent for service of process is CT Corporation System, 818 W. Seventh St., Los Angeles, CA 90017.

17.    Defendant Chicago Title Company is a California corporation with its principal place of business located at 2510 N. Redhill Avenue, Santa Ana, CA 92705. It is a subsidiary of Defendant FNF.  It provides title insurance policies and other real

1   estate settlement services. Its agent for service of process is CT Corporation System,

2   818 W. Seventh St., Los Angeles, CA 90017.

3       18.    Defendant Ticor Title Company of California is a California corporation

4   with its principal place of business located at 2510 N. Redhill Avenue, Santa Ana, CA

5   92705. It is a subsidiary of Defendant FNF. It provides title insurance policies and

6   other real estate settlement services. Its agent for service of process is CT Corporation

7   System, 818 W. Seventh St., Los Angeles, CA 90017.

8       19.    Defendant Lawyers Title Company is a California corporation with its

9   principal place of business located at 2510 N. Redhill Avenue, Santa Ana, CA 92705.

10  It is a subsidiary of Defendant FNF. It provides title insurance policies and other real

11  estate settlement services. Its agent for service of process is CT Corporation System,

12  818 W. Seventh St., Los Angeles, CA 90017.

13      20.    Defendant Commonwealth Land Title Company is a California

14  corporation with its principal place of business located at 2510 N. Redhill Avenue,

15  Santa Ana, CA 92705. It is a subsidiary of Defendant FNF. It provides title

16  insurance policies and other real estate settlement services. Its agent for service of

17  process is CT Corporation System, 818 W. Seventh St., Los Angeles, CA 90017.

18  **CLASS ACTION ALLEGATIONS**

19      21.    Plaintiff brings this action under F.R.C.P. 23 on behalf of a nationwide

20  plaintiff class (the "Class") consisting of:

21          All persons and entities in the United States who received

22          any real estate settlement service (including, but not limited to, home protection contracts and title services)

23          from any of the Defendants named herein in connection with the purchase or sale of a home financed by a

24          federally related mortgage during the period October 1, 2002 to the present (the "Class Period"), where any

25          portion of the fees or premiums for such settlement services was paid to any real estate broker or agent.

26          Excluded from the Class are Defendants, their parents, subsidiaries, and affiliates, all officers, directors,

27          employees, and agents of the Defendants and their parents, subsidiaries and affiliates, any real estate agent

28          or broker involved in any of the transactions at issue in this complaint, any agent or employee of any federal or

-6-

state government acting in their official capacity, and co-conspirators.

22.    Plaintiff brings this action both on behalf of himself, and as a class action under Federal Rule of Civil Procedure 23 on behalf of the following Subclass (the "Subclass"):

> All persons and entities who, during the period from November 23, 2007 through the present (the "Subclass Period"), purchased, received, or acquired a home protection contract issued by Defendant Fidelity National Home Warranty Company Excluded from the Subclass are Defendants, their parents, subsidiaries, and affiliates, all officers, directors, employees, and agents of the Defendants and their parents, subsidiaries and affiliates, any real estate agent or broker involved in any of the transactions at issue in this complaint, any agent or employee of any federal or state government acting in their official capacity, and co-conspirators.

23.    Plaintiff does not know the exact number of Class and Subclass members because such information is in the exclusive control of Defendants.  Upon information and belief, Plaintiff believes that there are hundreds of thousands of Class and Subclass members, geographically dispersed throughout the United States, such that joinder of all class members is impracticable.

24.    Plaintiff's claims are typical of the claims of the Class and Subclass in that:  Plaintiff purchased, received or acquired a home protection contract issued by Defendant FNHW during the Class Period; during the Class and Subclass Periods, Defendants violated California Insurance Code Section 12760 by paying commissions to persons as inducements or compensation for the issuance, purchase, or acquisition of home protection contracts and/or violated Section 8(a) of RESPA; Plaintiff and all Class and Subclass members were damaged by the same wrongful conduct of Defendants and their co-conspirators as alleged herein; and the relief sought is common to the Class and Subclass.

CLASS ACTION COMPLAINT

25.     Numerous questions of law or fact arise from Defendants' unfair and anticompetitive conduct that is common to the Class and Subclass.  Among the questions of law or fact common to the Class and Subclass are:

(a)     whether Plaintiff and the Subclass members purchased or acquired home protection contracts issued by Defendant FNHW during the Subclass Period;

(b)     whether during the Class Period Defendants paid a portion of the fees, premiums, and monies received for providing real estate settlement services to real estate brokers and/or agents;

(c)     whether Defendant FNHW issued and/or sold home protection contracts to Plaintiff and the Subclass during the Subclass Period;

(d)     whether Defendants engaged in unfair and/or unlawful business practices during the Class Period;

(e)     whether Defendants violated California Insurance Code Section 12760 by paying commissions to persons as inducements or compensation for the issuance, purchase, or acquisition of home protection contracts during the Subclass Period;

(f)     whether Defendants violated Section 8(a) of RESPA during the Class Period;

(g)     whether Plaintiff and the Subclass Members are entitled to restitution, and if so the measure of such restitution;

(h)     whether Plaintiff and the Class have been damaged, and if so the appropriate measure of such damages; and

(i)     whether class-wide declaratory and/or injunctive relief is appropriate and, if so, the proper measure of the declaratory and/or injunctive relief.

26.     These questions of law or fact are common to the Class and Subclass and predominate over any other questions affecting only individual class members.

27.     Plaintiff will fairly and adequately represent the interests of the Class and Subclass in that:  Plaintiff purchased, received and/or acquired a home protection

contract from Defendant Fidelity National Home Warranty Company during the Class Period; Plaintiff suffered damages and/or is entitled to restitution; and Plaintiff has no conflicts with any other member of the Class or Subclass. Furthermore, Plaintiff has retained competent counsel experienced in class-action litigation.

28.    A class action is superior to the alternatives, if any, for the fair and efficient adjudication of this controversy.

29.    Prosecution of separate actions by individual class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for the Defendants.

30.    Injunctive relief is appropriate as to the Class and Subclass as a whole because Defendants have acted or refused to act on grounds generally applicable to the Class and Subclass.

31.    Plaintiff reserves the right to expand, modify, or alter the class definitions in response to information learned during discovery.

## STATEMENT OF FACTS

**BACKGROUND FACTS**

32.    Defendant FNF is a holding company that through its subsidiaries provides home protection contracts, title insurance, mortgage services and diversified services. It is the nation's largest title insurance company through its title insurance underwriters — Fidelity National Title, Chicago Title, Lawyers Title, Commonwealth Land Title, and Alamo Title — which collectively issued more title insurance policies in 2010 than any other title company in the United States. During the Class Periods, FNF directly made payments and/or caused its subsidiaries to make payments to real estate agents and brokers in exchange for the referral of real estate settlement services involving federally related mortgages.

33.    Defendant FNHW began business in January 1995 as Alliance Home Warranty. Nonetheless, it advertises itself as having "over 29 years of industry experience."

34.     Defendant FNHW changed its name to FNHW after being acquired by
Fidelity National Financial, Inc. ("FNF") in 1998.  The "financial strength and
backing of our parent company, "Fidelity National Financial, Inc.," is one of the
reasons FNHW identifies in its brochures and advertisements as to why homeowners
should choose one of its home warranty plans.

35.     FNHW sells home protection contracts to homeowners that obligate it to
repair or replace covered systems and appliances that become inoperable due to
normal wear and tear during the term of a contract.

36.     FNHW is part of a larger group of companies ultimately controlled by
Defendant Fidelity National Financial, Inc.  FNHW is completely controlled by FNF.
According to the Report of Examination of FNHW by the California Department of
Insurance as of December 31, 2007, FNHW had five individuals on its board of
directors, four of whom were high-level FNF executives – FNF's President Raymond
Quirk, FNF's Chief Operating Officer Alan Stinson, FNF's Chief Financial Officer
Anthony J. Park, and FNF's Executive Vice President Roger Jewkes.   Moreover, each
year FNHW pays large cash dividends to its parent companies, including FNF, that
equal or exceed its net income.  In 2007, for example, FNHW collected home
protection contract fees of $64,436,734 and had a net income of $ 9,066,973.  It paid a
$9,500,000 cash dividend to its parent companies, which include FNF.  From 2004 to
2007, FNHW earned net income of $27,055,572, and it paid cash dividends to its
parent companies of $ 26,200,000.

37.     According to the December 31, 2007 Report of Examination of FNHW
by the California Department of Insurance, FNHW's sale of home protection contracts
"is written through a sales force of 60 sales representatives *who make contact with
real estate professionals*. The Company has three vice presidents of sales; one to
manage the Northern California sales force, one to manage the Southern California
sales force, and the third to manage the Northwest and Southwest sales force."
(emphasis added).

## RESPA ALLEGATIONS

38.    Congress enacted the Real Estate Settlement Procedures Act ("RESPA") to shield home buyers "from unnecessarily high settlement charges by certain abusive practices." 12 U.S.C. § 2601(a). 12 U.S.C. § 2607(a) provides, "No person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person."

39.    During the Class Period, Defendants and their subsidiary and parent companies marketed and sold real estate settlement services, including but not limited to home protection contracts, escrow services, title policies and services, and other products and services throughout the United States using real estate brokers and agents.  The real estate settlement services were sold during the Class Period to consumers as part of escrows involving the purchase and sale of residential homes involving federally insured mortgage loans.  Defendants incentivized the real estate brokers and agents to sell their home protection contracts, title policies, escrow services and other real estate settlement services by paying the agents and brokers a fee, kickback or commission in exchange for the referral of the real estate settlement service.

40.    The fees, kickbacks, or commissions paid by Defendants to the real estate agents and brokers were directly tied to the number of home protection contracts, title policies, and other real estate settlement services sold through escrow.  Due to Defendants' payment of the fees, kickbacks, or commissions paid by Defendants, the prices of the real estate settlement services provided by Defendants to Plaintiff and the Classes during the Class Period were inflated, and were higher than they would have been if the kickbacks or commissions had not been paid.

41.    The real estate agents and brokers did not provide any real estate settlement services, or if any services were provided they were not actual, necessary

1    and distinct from the primary services provided by the real estate broker or agent,

2    were not nominal, and were duplicative of other fees charged.

3        42.    Specifically, during the Class Period, Defendant FNF entered into

4    Application Service Provider Agreements with real estate brokers and agents which

5    provided the agents and brokers access to TransactionPoint, a web-based platform that

6    automates a real estate transaction from listing to closing, and allows the real estate

7    agent or broker to select real estate settlement service providers such as Defendants

8    and their subsidiary companies.

9        43.    The real estate brokers and agents, in turn, entered into Sub-License

10    Agreements with subsidiaries of Defendant FNF, including Defendants Fidelity

11    National Home Warranty Company, Fidelity National Title Insurance Company,

12    Chicago Title Company, Lawyers Title Company, Commonwealth Land Title

13    Company, and Ticor Title Company of California, to enable FNF's subsidiaries to be

14    listed in the TransactionPoint software as providers of real estate settlement services.

15        44.    As part of the Sub-License Agreements, Defendant FNF and/or its

16    subsidiaries, including Defendants, paid the real estate agents and brokers a fee for

17    each referral of the real estate settlement service provided.   These payments were not

18    in exchange for settlement services actually provided and were not nominal payments.

19    In the case of kickbacks in exchange for the referral of home protection contracts, for

20    example, the payments averaged approximately one-fifth the premium for such

21    policies.

22        45.    Defendants have been utilizing the TransactionPoint software since the

23    beginning of the Class Period as a means to track kickbacks owed to real estate agents

24    and brokers.

25        46.    On August 1, 2001, Fidelity National Information Solutions (FNIS) was

26    formed by FNF, creating a services provider of real estate-related information and

27    technical solutions.  FNF owned a majority of the shares of FNIS and operated it as a

28    majority-owned subsidiary of FNF.

47.  In October 2002, the National Association of Realtors (NAR) announced the selection of TransactionPoint(TM) as its new REALTOR VIP(SM) Program partner.

48.  On May 14, 2003, the adoption of the TransactionPoint software continued when Re/MAX signed contracts to install the software.  Defendant FNF issued the following press release announcing the development:

SANTA BARBARA, Calif., May 14, 2003 /PRNewswire-FirstCall via COMTEX/ --

FNIS, the nation's most comprehensive source for real estate-related data, technology solutions and services, and several RE/MAX broker offices have signed contracts to install the FNIS TransactionPoint(TM) transaction management platform. The new contracts are the first of many TransactionPoint(TM) platform installations signed by RE/MAX Broker-owners or Associates indicating major inroads in national acceptance of FNIS' industry-leading automated transaction platform by the influential RE/MAX franchises.

RE/MAX broker-owners' selection of FNIS real estate technology and services reflects a significant trend in new FNIS TransactionPoint suite installations in major RE/MAX strongholds across the U.S. Representing more than 430 new broker-agents with growing transaction volumes in central and western regions, FNIS will continue this aggressive implementation campaign nationwide throughout 2003.

"Successful professional REALTORS(R) and large brokers have responded very positively to our products, and as one of the real estate industry's leading technology advocates, RE/MAX immediately recognized the inherent value their broker-owners could derive from FNIS TransactionPoint," said FNIS Chief Executive Officer Patrick F. Stone. "It is extremely gratifying to see leading industry icons such as these RE/MAX broker-owners embrace FNIS TransactionPoint as their own business management tool," Stone continued.

For five years now Ruth Boss, RE/MAX Broker/Owner of The Dominion Group based in Oklahoma City, Oklahoma sought a reliable transaction management solution. "Others have promised an answer, but we felt that FNIS had the best solution versus any other competitors," said Boss. "FNIS impressed us by pulling the entire process together. Presently, our group has three offices with 80 Agents, and we process close to 2,500 transactions yearly. We are pleased to be the first in the metro area to get the FNIS TransactionPoint suite

and we feel it will enable our sales team to operate much more efficiently. In our part of the country, the buyers and sellers are technologically savvy and RE/MAX is already ahead of the other franchises because our Agents possess above-average technical skills," Boss stated.

"Although we've been involved in transaction coordination for more than four years and have tried many systems, FNIS' TransactionPoint offers us the most possibilities for our 250 agents," said Dennis Badagliacco, president of RE/MAX Valley Properties in San Jose, California. "Since the January 2003 installation, every transaction in the company is going into the FNIS platform ... without exception. We made this decision because we felt that in order to get the best economies of scale, we had to standardize," he said.

"Today the agents are in love with the platform -- they use it as a listing tool and we use it as a recruiting tool. We just hired the number one agent ($57 million in production in 2002) from our competition, and he is ecstatic about TransactionPoint. We've pushed the online transaction platform out to our agents because we felt that the transaction -- if not automated -- could never be improved upon from a client and agent perspective. TransactionPoint's Web-based system allows us to have access to the transaction 24x7, with a platform to enhance the transaction, our profitability and high volumes ... all at once. We have used a lot of platforms previously, so we feel completely confident that FNIS was offering us the best platform out there today," Badagliacco concluded.

Diana Bull, Broker-owner of RE/MAX Santa Barbara states that she finally found the real estate transaction management solution that has eluded her for the past five years in FNIS' TransactionPoint platform. "We actually spoke with FNIS at the National Association of Realtors (NAR) 2002, to evaluate TransactionPoint, and after a two-hour demonstration, it was clear that FNIS had all of the 'bells and whistles' that we needed," Bull said.

"TransactionPoint epitomizes FNIS' commitment to detail and large R&D investment in creating this powerful business management tool. In today's competitive market, 'Knowledge is Power.' With TransactionPoint's increased efficiencies, our clients and staff have gained the power they needed to track the real estate transaction process from start through finish, quickly and cost-effectively. Now, they truly enjoy getting their jobs done. FNIS' entire team was outstanding through our evaluation, contract and implementation phase," said Bull.

The National Association of REALTORS(R) (NAR) announced the selection of FNIS TransactionPoint(TM) as its new REALTOR VIP(SM) Program partner,

offering REALTORS(R) control over the real estate transaction, in October
2002.

The FNIS TransactionPoint services suite increases efficiencies, reduces time,
closes more transactions and earns more revenue for agents and brokers.
Designed as an ASP model, this powerful business management tool offers
online order entry, status tracking, proactive e-mail, notification, activity log,
document uploads and management, calendar, user access privileges,
communication functionality (FAX, JFAX, word processing and e-mail).

49.    On July 11, 2003, FNF and FNIS announced terms of a merger
agreement whereby FNF acquired all the outstanding stock of FNIS that it did not
already own. Under the terms of the merger agreement, each share of FNIS common
stock was exchanged for a share exchange ratio of 0.830 shares of FNF common
stock, subject to certain conditions. The merger was subject to FNIS stockholder
approval. FNF was already, at the time, the majority stockholder of FNIS.

50.    On September 17, 2003, Defendant FNF announced an upgrade to the
TransactionPoint software in a press release which stated:

SANTA BARBARA, Calif., Sep 17, 2003 /PRNewswire-FirstCall via
COMTEX/ --

Fidelity National Information Solutions (Nasdaq: FNIS), the nation's most
comprehensive source for real estate-related data and valuations, technology
solutions, and services, today announced the release of TransactionPoint v6.0.
TransactionPoint v6.0 introduces significant improvements to the platform's
document management system, automated routing and storing of transaction
documents, as well as enhanced system-wide performance, ease of use,
improved reporting capabilities and significant advancements in transaction
coordination and management.

"TransactionPoint provides a comprehensive, integrated, single-solution for the
management of all of our transactions, from listing to closing," said Dennis
Badagliacco, Broker/Owner, RE/MAX Valley Properties. "Version 6.0
enhancements include broader access for our administrators, expanded options
and speedy drill-down product details that make us more efficient. It is a real
win-win scenario for everyone," Badagliacco said.

TransactionPoint v6.0 leverages RealEC(R) Technologies' open platform, that
provides real estate brokers, agents and their customers access to over 2,300

lenders, including the top 10 lenders in the United States. The TransactionPoint v6.0 platform also incorporates private-branded, customer- facing Web sites, and provides an integrated, private-branded TransactionPoint Consumer Center.

"TransactionPoint v6.0 enables real estate brokers and agents to maintain better communications during a real estate transaction," said Dwayne Walker, FNIS President and COO. "TransactionPoint v6.0 significantly enhances transaction coordination and management and enables brokers and real estate agents to directly access and manage all transaction-related information and documents online, in real-time. Brokers and agents may also use this secure, Internet-based document and transaction management system to provide their customers with immediate access to information regarding their transactions," Walker said.

ABOUT FNIS

Fidelity National Information Solutions, Inc. (Nasdaq: FNIS) provides Data and Valuations, Solutions and Services to lenders, real estate professionals, settlement companies, vendors and other participants in the real estate industry. The data and valuations segment targets the information needs of lenders, originators, real estate professionals and residential loan servicers and provides the information solutions that these mortgage professionals require in selling homes and underwriting mortgage loans. The solutions division provides technology products and services. FNIS is the nation's largest provider of Multiple Listing Services (MLS) systems and supplies tools that allow real estate professionals and brokers to improve efficiency, lower costs and better manage their businesses. The solutions division also provides software to lenders and those engaged in the settlement of real estate transactions. The services segment adds value by combining manual intervention, outsourcing or process improvement with one or more of the Company's data or solutions components.

FNIS is a majority-owned subsidiary of Fidelity National Financial, Inc. (NYSE: FNF), a Fortune 500 company and the nation's largest title insurance and diversified real estate-related services company. FNF's title insurance underwriters -- Fidelity National Title, Chicago Title, Ticor Title, Security Union Title and Alamo Title -- together issue approximately 30 percent of all title insurance policies nationally. The company provides title insurance in 49 states, the District of Columbia, Guam, Mexico, Puerto Rico, the U.S. Virgin Islands and Canada.

51.    In 2004, Fidelity National Real Estate Solutions, a wholly-owned subsidiary of FNF,  implemented a fully integrated suite of Web-based tools,

-16-

including Fidelity's BrokerOffice and AgentOffice systems, with the stated purpose of enabling real estate agents and brokers to take advantage of Internet-based leads and business opportunities.  In reality, the main purpose of this software and the TransactionPoint software was to allow FNF and its subsidiaries to encourage real estate brokers and agents to recommend Fidelity's real estate settlement services, to track which real estate brokers and agents had referred business to Fidelity, and then to track which kickbacks were owed to which real estate brokers and agents.

52.    During the Class Period, Defendants have fabricated, in an effort to disguise their violations of RESPA, phony services which could be attributed to the real estate agents in the event of an investigation.  For example, Defendants sometimes devised a story that real estate agents were performing an inspection of the home being sold, and then purported to pay the agents for such inspection to disguise the payment of an illegal referral fee under Section 8 of RESPA.  But real estate agents are already under an obligation to perform a visual inspection of the property prior to the close of escrow, and the agents paid by Defendants did not perform any actual inspection and/or no additional inspection beyond what they were already under an obligation to perform as part of their duties as real estate agents.  Moreover, since the agents were already being paid for the agent/broker services they provided to the consumer, any additional payment made to them by Defendants was not a payment for any service actually performed but was, instead, an illegal kickback for the referral of settlement services.

53.    As another example, during the Class Period Defendants also sometimes fabricated a story or explanation that they were paying the real estate agents a "marketing fee" or "administrative fee" for promoting and/or placing the home protection contracts or other real estate settlement services sold by Defendants through escrows involving federally related mortgages.  The "marketing fees" were not paid for any service actually performed, and were entirely devised as a means to attempt to disguise the illegal kickbacks and avoid detection by consumers, HUD and

federal and state regulators.  As noted *infra*, HUD has definitively found that payment of marketing fees under these circumstances constitutes a violation of Section 8 of RESPA.

54.    On June 3, 2011, Defendant FNF issued a Memorandum to all the real estate brokers and agents with whom it had business agreements.  The Memorandum stated:

> "The United States Department of Housing and Urban Development (HUD) has advised Fidelity National Financial (FNF) that the payments under FNF Real Estate Service Provider Access Agreements associated with the TransactionPoint transaction management software may violate the Real Estate Settlement Procedures Act (RESPA), 12 USC Section 2601 et seq. and its implementing regulations.

> "As a result, FNF has decided to voluntarily suspend payments to Brokers in conjunction with any FNF Real Estate Service Provider Access Agreements associated with TransactionPoint as of the close of business on May 27, 2011.

> "Please understand that this does not have any effect on the use of the TransactionPoint system. . . We hope you will continue to use the TransactionPoint system as you always have and we look forward to processing your orders via TransactionPoint.  We sincerely appreciate your business and support."

55.    On July 11, 2011, HUD announced that FNF had agreed to pay $4.5 million as a fine due to its RESPA violations, including the payment of commissions to real estate agents for the referral of real estate settlement services:

HUD No. 11-142                          FOR RELEASE
Brian Sullivan                                Monday
202) 708-0980                            July 11, 2011

**HUD SETTLES RESPA KICKBACK CASE AGAINST
FIDELITY NATIONAL FINANCIAL**
*Title company to pay $4.5 million and cease paying brokers referral fees*

WASHINGTON – The U.S. Department of Housing and Urban Development (HUD) today announced an agreement with Fidelity National Financial, Inc. (FNF) to settle allegations the title company paid real estate brokers and other settlement service providers

-18-

improper kickbacks or referral fees in violation of the *Real Estate Settlement Procedures Act (RESPA)*. **Read the full text of the agreement announced today**.

HUD claimed FNF and its affiliates and subsidiaries engaged in a widespread and years-long campaign to pay real estate brokers kickbacks for the referral of real estate settlement services, including home warranties and title insurance. FNF agreed to cease this practice and pay HUD $4.5 million to resolve the complaint.

"RESPA is very clear that paying fees or providing anything of value for the simple act of referring business is a violation of law," said Acting FHA Commissioner Robert Ryan. "This agreement should be a signal to others that these business practices won't be tolerated."

HUD alleges that FNF, through its subsidiaries, paid fees for the referral of settlement service business in violation of Section 8 of RESPA. To facilitate these payments, real estate brokerages entered into "Application Service Provider Agreements" which provided the real estate brokerages access to *TransactionPoint*, a web-based platform that automates the real estate transaction from listing to closing. This online system also allows the brokers to select real estate settlement providers for a particular real estate transaction. The real estate brokerages, in turn, entered into Sub-License Agreements with subsidiaries of FNF to enable FNF's subsidiaries to be listed in *TransactionPoint* as a provider of settlement services. As part of the Sub-Licensee Agreement, HUD alleges that FNF's subsidiaries paid the real estate brokerages a fee for each referral of real estate settlement services.

RESPA was enacted in 1974 to provide consumers advance disclosures of settlement charges and to prohibit illegal kickbacks and excessive fees in the homebuying process. Section 8 of RESPA prohibits a person from giving or accepting anything of value in exchange for the referral of settlement service business.

56.     Moreover, with respect to the kickbacks paid to real estate agents by Defendants for the referral of home protection contracts to consumers, recent HUD rulings make it clear that Defendants' business arrangements with real estate agents violate RESPA.  Since 1992, the RESPA regulations promulgated by the United States Department of Housing and Urban Development ("HUD") have expressly

included services relating to home protection contracts as "settlement services." *See* 24 C.F.R. §3500.2.

57.    HUD has also issued an advisory opinion letter (the "Advisory Opinion") on February 21, 2008 holding that a transaction in which a real estate broker or agent receives a fee only when a consumer purchases or receives a home warranty contract is likely a violation of Section 8 of RESPA.  HUD's letter finds that RESPA is likely violated when home warranty companies such as Defendant FNHW enter into either of the following two types of arrangements:

(a)    Marketing Agreement.  A "Marketing Agreement" is an agreement pursuant to which a home warranty company such as Defendant FNHW enters into an arrangement with a real estate agent or broker pursuant to which the broker or agent agrees to provide numerous, varied, and sundry marketing-related services to promote the sale of the home warranty company's home warranty contracts.  The real estate agent or broker is only compensated when a consumer purchases a home warranty contract.

(b)    Administrative Services Agreement.  An "Administrative Services Agreement" is an agreement between a real estate agent or real estate broker and a home warranty company.  Under this agreement the real estate agent/broker agrees to perform numerous, varied, and sundry administrative-related services to promote the home warranty company's product. As under a "Marketing Agreement," the real estate agent/broker is compensated only when the consumer purchases a home warranty contract.

58.    HUD further noted that Section 8(c) of RESPA "provides on exception to this prohibition on fees and kickbacks for bona fide compensation for "good or facilities actually furnished for services actually performed." HUD stated that this exception would not apply in a situation where the real estate agent was only compensated if the home warranty contract was actually purchased. "Because the payments are based on the number of successful transactions, they appear to be

payments made pursuant to an agreement or understanding to refer business to the [home warranty company, and not payments for services actually performed." Exhibit A, at p. 2. Furthermore, characterizing "such arrangements as "marketing" or "administrative" agreements does not render the underlying conduct legal." *Id.* These kinds of payments made by home warranty providers to real estate agents are "only a means to facilitate payments for referrals by persons in a position to refer settlement service business, in violation of RESPA." *Id.*

59.    After HUD issued its February 21, 2008 Advisory Opinion, Defendant Fidelity National Home Warranty Company ("FNHW"), together with several of its competitors and the National Association of Realtors ("NAR"), urgently petitioned HUD to retract the Advisory Opinion.  The NAR is a national membership group for realtors which spends significant sums of money lobbying Congress and governmental agencies on issues relevant to realtors. To assist them in their lobbying efforts, NAR used Phillip L. Schulman at K&L Gates and Defendant FNHW used Art Chartrand.

60.    These lobbying efforts culminated in a meeting on Thursday, April 3, 2008 between, among others, Defendant FNHW, the NAR, and executives at HUD, including Ivy Jackson, Director of HUD's Office of RESPA and Interstate Land Sales, and Deputy Assistant Secretary Cunningham.  During the meeting, Defendant FNHW and the NAR sought a retraction of the Advisory Opinion.  As a backup, given the fact that Defendants were paying the real estate agents and brokers kickbacks pursuant to the marketing and administrative services agreements, Defendants and the NAR asked HUD to discard the bright line rule articulated in the Advisory Opinion and instead adopt a "case by case" approach to determining whether Defendants' marketing and administrative services agreements with real estate agents violate RESPA.  After the meeting, Joseph Ventrone, Vice President of the NAR, was tasked with sending a follow up letter to Ms. Jackson on behalf of the NAR and the other participants in the

April 3, 2008 meeting, including Defendant FNHW. In a May 21, 2008 letter to Ms. Jackson, Mr. Ventrone of the NAR stated:

> "NAR respectfully requests that HUD retract the Advisory Opinion pending its further consideration of this matter. At a minimum, we would ask that HUD publish clarification expressly stating that marketing and administrative services agreements between a real estate broker or agent and a HWC [home warranty company] require case-by-case analysis and will comply with RESPA so long as the broker or agent performs services that are actual, necessary and distinct from the broker's or agent's primary real estate duties and the HWC pays the broker or agent no more than fair market value compensation in return for the services performed. We ask that such a retraction be done immediately, so that HUD may alert the settlement services industry that providers should not rely on the February 21st Advisory Opinion."

61.    Thus, knowing that its conduct had been determined to violate Section 8(b) of RESPA, Defendants asked HUD to vacate its Advisory Opinion so that Defendants could continue their violations of RESPA. HUD declined this request, refused to vacate its Advisory Opinion, and refused to modify the Advisory Opinion in any manner whatsoever.

62.    In the May 21, 2008 letter from NAR to HUD, Defendants acknowledged that the Advisory Opinion "suggests that there are no services whatsoever that a real estate broker or agent could perform for a HWC that would be compensable under Section 8 of RESPA, and it proclaims that both marketing and administrative services agreements between real estate brokers/agents and HWCs likely would violate the Act." The letter further acknowledged that "The Department's conclusions in the Advisory Opinion, however, are tantamount to an outright ban on marketing and administrative services agreements between real estate brokers/agents and HWCs."

63.    The letter frankly admitted the agreements pursuant to which Defendants FNF and FNHW and other home warranty companies were paying kickbacks to real estate agents, but argued that real estate agents were providing services separate from the referral of real estate settlement services and that the "brokers and agents are entitled to be compensated the reasonable value for their services." The letter also

frankly admitted that home warranty companies were paying real estate agents "*a flat fee per home warranty application submitted to the HWC.*"

64.    While the NAR advocated in the letter for the position that real estate agents were providing services separate and apart from the mere referral of real estate settlement services to corporations such as Defendants, the NAR acknowledged  that the Advisory Opinion "*suggests that real estate brokers/agents would have difficulty ever showing that the services performed under such agreements merit compensation and that transaction-based compensation essentially renders their compensation a sham.*"

65.    Defendants continued their practice of paying illegal kickbacks to real estate agents and brokers, notwithstanding the February 21, 2008 Advisory Opinion and notwithstanding the overwhelming failure of Defendants' concerted and substantial lobbying efforts.  Defendants also continued to conceal the payments.

66.    Moreover, on June 25, 2010, HUD issued an Interpretative Rule entitled "Real Estate Settlement Procedures Act (RESPA):  Home Warranty Companies' Payments to Real Estate Brokers and Agents."  *See* 75 Fed. Register 122 (June 25, 2010), pp. 36271-36273 (attached hereto as **Exhibit 1**).  HUD issued the Interpretative Rule in response to inquiries it received in response to its February 21, 2008 letter.  In the Interpretative Rule, HUD stated:

> "In some circumstances, marketing services performed on behalf of an HWC are not compensable services. In particular, a real estate broker or agent is in a unique position to refer settlement service business and through marketing can affirmatively influence a homebuyer's or seller's selection of an HWC. As a real estate broker and agent hold positions of influence in the real estate transaction, a homebuyer or seller is more likely to accept the broker's or agent's promotion or recommendation of a settlement service provider. Therefore, *marketing performed by a real estate broker or agent on behalf of an HWC to sell a homeowner warranty to particular homebuyers or sellers is a "referral" to a settlement service provider.*"
>
> *Accordingly, in a transaction involving a federally related mortgage loan, an HWC's compensation of a real estate*

***broker or agent for marketing services that are directed to particular homebuyers or sellers would be a payment that violates section 8 of RESPA as an illegal kickback for a referral of settlement service business.*** For example, a real estate broker or agent actively promoting an HWC and its products to sellers or prospective homebuyers by providing HWC verbal ''sales pitches'' about the benefits of a particular HWC product or by distributing the HWC's promotional material at the broker's or agent's office or at an open house is considered to be a referral. Thus, compensating the real estate broker or agent for such promotion would result in a violation of section 8 of RESPA.

*See* 75 Fed. Register 122 (June 25, 2010), at p. 36272.

67.     HUD invited public comments to its June 25, 2010 Interpretive Rule. In response to the comments received, HUD issued a Response to Public Comments (the "Response") on November 23, 2010 (attached hereto as **Exhibit 2**).  Although it received some negative comments, it did not change any part of the June 25, 2010 Interpretive Rule.  In the Response, HUD again reiterated that a home protection/warranty company's payment of a flat fee to real estate agents for marketing services violates Section 8 of RESPA as an illegal kickback for the referral of a settlement service, regardless of whether the payment is made to the broker or agent on a "flat fee" or "per transaction" basis.

## ALLEGATIONS REGARDING DEFENDANTS' VIOLATION OF CALIFORNIA INSURANCE CODE SECTION 12760

68.     During the Subclass Period, Defendant FNHW was a "home protection company" as defined by Cal. Ins. Code Section 12740(b).  Defendant FNHW further sold, during the Subclass Period, "home protection contracts," which are defined as "a contract or agreement whereby a person, other than a builder, seller, or lessor of the home which is the subject of the contract, undertakes for a specified period of time, for a predetermined fee, to repair or replace all or any part of any component, system or appliance of a home necessitated by wear and tear, deterioration or inherent defect,

1  arising during the effective period of the contract, and, in the event of an inspection

2  conducted pursuant to subdivision (b) of Section 12761, by the failure of that

3  inspection to detect the likelihood of any such loss."  Cal. Ins. Code Section 12740(a).

4        69.    During the Subclass Period, Defendants and/or their parents and

5  subsidiaries paid real estate agents and/or brokers commissions as an inducement or

6  compensation for the issuance, purchase or acquisition of home protection contracts

7  issued by Defendant FNHW.  Defendant FNHW is a California corporation.  During

8  the Subclass Period, it was headquartered, and remains headquartered, in Concord,

9  California.  While FNHW sold home warranty contracts in California, Arizona,

10  Nevada, Colorado, Washington and Oregon during the Subclass Period, all its home

11  warranty plans were drafted at its headquarters in Concord, California.  Moreover, all

12  such contracts were entered into by FNHW from its headquarters in Concord,

13  California and all such contracts listed a Post Office Box in San Francisco, California

14  as FNHW's address for purposes of the contract.

15        70.    Moreover, all FNHW's agreements with real estate agents and brokers,

16  pursuant to which FNHW and/or FNF agreed to pay fees and commissions to real

17  estate agents as inducements and compensation for the issuance, purchase, or

18  acquisition of FNHW home warranty plans, were negotiated by FNHW from its

19  headquarters in Concord, California.

20        71.    California Insurance Code Section 12760 provides:

21        "No home protection company shall pay a commission to any
person as an inducement or compensation for the issuance,

22  purchase or acquisition of a home protection contract, nor shall
a home protection company or any other insurer either directly

23  or indirectly, as a part of any real property transaction in which

24  a home protection contract will be issued, purchased or
acquired, require that a home protection contract be issued,

25  purchased or acquired in conjunction with or as a condition
precedent to the issuance, purchase or acquisition, by any

26  person, of any other policy of insurance. The provisions of this

27  section shall not prohibit payment of an override commission or
marketing fee to an employee or commission sales agent who is

28

-25-

the marketing representative of the home protection company or its parent, subsidiary, or affiliate on the sale or marketing of a home protection contract, provided such person is not a real estate licensee sharing in or entitled to share in, or affiliated with a real estate brokerage firm which is entitled to share in the real estate commission generated by the underlying real property transaction."

72.     During the Subclass Period, Defendants also either directly or indirectly, as a part of real property transactions in which home protection contracts were issued, purchased or acquired, required that FNHW's home protection contracts be issued, purchased or acquired in conjunction with or as a condition precedent to the issuance, purchase or acquisition, by any person, of any other policy of insurance.

73.     Because of Defendants' payments of such commissions, the prices of FNHW's home protection contracts were inflated during the Subclass Period, and were higher than they would have been absent payment of the commissions.  As a result, Plaintiff and the Subclass suffered harm.

74.     During the Subclass Period, Defendants entered into Application Service Provider Agreements with real estate brokers and agents which provided the agents and brokers access to TransactionPoint, a web-based platform that automates a real estate transaction from listing to closing, and allows the real estate agent or broker to select real estate settlement service providers such as Defendants and their subsidiary companies.

75.     The real estate brokers and agents, in turn, entered into Sub-License Agreements with subsidiaries of Defendant FNF to enable FNF's subsidiaries to be listed in the TransactionPoint software as a provider of real estate settlement services.

76.     As part of the Sub-License Agreements, Defendants and/or their parents and subsidiaries paid the real estate agents and brokers a fee for each referral of home protection contracts.  The kickbacks in exchange for the referral of home protection contracts were not nominal, and averaged approximately one-fifth the premium for such policies.

77.     As noted *supra*, after HUD issued the February 21, 2008 Advisory
Opinion, the NAR, in combination with Defendant FNHW and some of its
competitors who were also paying commissions and fees to real estate agents, sent a
letter to HUD dated May 21, 2008 which frankly admitted the agreements pursuant to
which Defendants FNHW and/or FNF were paying kickbacks to real estate agents.
The letter also frankly admitted that home warranty companies were paying real estate
agents "*a flat fee per home warranty application submitted to the HWC.*"

78.     While the NAR advocated in the letter for the position that real estate
agents were providing services separate and apart from the mere referral of real estate
settlement services to corporations such as Defendants, the NAR acknowledged  that
the Advisory Opinion "*suggests that real estate brokers/agents would have difficulty
ever showing that the services performed under such agreements merit
compensation and that transaction-based compensation essentially renders their
compensation a sham.*"

79.     Whether the real estate agents and brokers were providing any services
whatsoever in exchange for the admitted payments is completely irrelevant to
Defendant FNHW's violation of Cal. Ins. Code Section 12760 since the statute is an
absolute prohibition of payments to real estate agents by home protection companies
such as FNHW.  Defendants wholeheartedly admitted that the whole purpose of the
payments was to influence real estate agents to promote their home protection
contracts.  The May 21, 2008 letter to HUD from the NAR plainly stated that home
warranty companies such as FNHW were paying real estate agents *for "[t]he work
required to market and sell a home warranty.*"  The letter not only admitted the
practice, but also boldly stated that "real estate brokers/agents are entitled to
reasonable compensation for marketing and administering [home warranties] on
HWC's [home warranty companies'] behalf."  There could be no more clear-cut and
unambiguous violation of Cal. Ins. Code Section 12760.

80.     Notwithstanding the February 21, 2008 Advisory Opinion and
notwithstanding the overwhelming failure of Defendants' concerted and substantial
lobbying efforts, Defendant FNHW, individually and/or in concert with Defendant
FNF, continued its practice of paying commissions and fees to real estate agents and
brokers as an inducement or compensation for the issuance, purchase or acquisition of
home protection contracts issued by Defendant FNHW.  They also continued to
conceal the payments from Plaintiff and the Subclass.

81.     On June 3, 2011, Defendant FNF issued a Memorandum to all the real
estate brokers and agents with whom it had these business agreements.  The
Memorandum stated:

> "The United States Department of Housing and Urban
> Development (HUD) has advised Fidelity National Financial
> (FNF) that the payments under FNF Real Estate Service
> Provider Access Agreements associated with the
> TransactionPoint transaction management software may violate
> the Real Estate Settlement Procedures Act (RESPA), 12 USC
> Section 2601 et seq. and its implementing regulations.

> "As a result, FNF has decided to voluntarily suspend
> payments to Brokers in conjunction with any FNF Real Estate
> Service Provider Access Agreements associated with
> TransactionPoint as of the close of business on May 27, 2011.

> "Please understand that this does not have any effect on
> the use of the TransactionPoint system. . . We hope you will
> continue to use the TransactionPoint system as you always have
> and we look forward to processing your orders via
> TransactionPoint.  We sincerely appreciate your business and
> support."

## EQUITABLE TOLLING

82.     During the relevant period, Plaintiff did not discover and could not have
discovered through the exercise of due diligence Defendants' violations of RESPA
and California law because Defendants did not disclose, and actively concealed, their
unlawful payments of referral fees and commissions to the real estate agents and
brokers.  Plaintiff was unaware of and had no knowledge of Defendants' business
arrangements and agreements among and between themselves and/or the real estate
agents and brokers.

-28-

83.     Plaintiff could not have discovered Defendants' violations of law prior to filing suit because Defendants made absolutely no disclosure of the kickbacks to the real estate agents and brokers in the escrow documents, HUD-1 statements, any other documents. Thus, none of the documents provided to Plaintiff made any disclosure of any payment/kickback to the real estate agents or brokers for the referral of real estate settlement services.

84.     Indeed, in the May 21, 2008 letter from the NAR to HUD, the NAR admitted that absolutely no disclosure has ever been made to consumers about the kickbacks and fees paid to real estate agents during the Class Period. The letter stated:

> "Finally, please note that NAR would support and promote any requirement that a real estate broker/agent disclose to consumers that the broker/agent is receiving compensation for taking the home warranty application and performing marketing and other services for the HWC [home warranty company]. While NAR fervently maintains that marketing and administrative services agreements between HWCs and real estate brokers/agents comply with RESPA, NAR likewise believes in open and honest communication with consumers and **would endorse full disclosure** of the relationships to customers."

85.     Despite its protestation that it "would endorse" disclosure of these concealed kickbacks, the NAR and the Defendants herein never did disclose the kickbacks. Apparently, the NAR's "spirit of full disclosure" and good faith was conditioned on HUD vacating its Advisory Opinion. Once that did not happen, NAR and Defendants apparently lost interest in adopting a new policy of "full disclosure" and reverted to the status quo – no disclosure whatsoever.

86.     Moreover, as noted *supra*, Defendants not only failed to disclose any information whatsoever that would have allowed Plaintiff, exercising due diligence, to discover the illegal kickbacks, but Defendants intentionally fabricated untrue and non-existent services allegedly performed by the real estate agents in order to attempt to disguise the illegal kickbacks and avoid detection by consumers, HUD and federal and state regulators. These intentional efforts at concealment were wildly successful, as Defendants avoided detection by HUD until July 2011.

87.    Moreover, the TransactionPoint software used by Defendants concealed the payments since it provided Defendants with a non-public way to keep track of which real estate agents were owed kickbacks for referring specific real estate settlement services sold by Defendants.  Since it was software used internally by the real estate agents and Defendants, it did not show up on the HUD-1 statements or other escrow documents and thus did not alert consumers or regulators as to the kickbacks.  In addition, Defendants' conduct constitutes a continuing violation of the law, and thus Plaintiff's claims did not accrue until exposure of the Defendants' illegal conduct by HUD in July 2011.

## FIRST CAUSE OF ACTION

### (Violation of Bus. & Prof. Code § 17200 – On Behalf of
### Plaintiff and the Subclass Against Defendant FNHW)

88.    Plaintiff repeats and realleges the allegations contained above, except those pertaining to the "RESPA Allegations" in paragraphs 38 -- 67, as if fully stated herein.

89.    The Unfair Trade Practices Act defines unfair competition to include any "unfair," "unlawful," or "fraudulent" business act or practice.  Cal. Bus. & Prof. Code § 17200.  Unfair competition also includes "unfair, deceptive, untrue or misleading advertising." *Id.*  The Act also provides for injunctive relief and restitution for violations. *Id.* § 17203.

90.    This cause of action is brought on behalf of Plaintiff, members of the Subclass, and members of the general public pursuant to California Business & Professions Code sections 17200 et seq.  Under Business & Professions Code § 17200 et seq., Plaintiff is entitled to enjoin Defendant's wrongful practices and to obtain restitution for the monies paid to Defendants by reason of Defendant's unlawful, unfair, and/or deceptive acts and practices.

91.    As a direct and proximate result of the acts and practices alleged above, members of the Subclass and the general public have been exposed to Defendant's

-30-

1    unfair business practices and have been injured or threatened with injury and harm.

2    This Court is empowered to, and should, order restitution to all persons from whom

3    Defendant may have unfairly and/or unlawfully obtained money and property.

4         92.    Defendant's unlawful, unfair, and fraudulent business acts and practices,

5    as described above, present a continuing threat to members of the Subclass and of the

6    general public, in that Defendant is continuing, and will continue, unless enjoined, to

7    commit violations of California Insurance Code Section 12760 and Business &

8    Professions Code § 17200.  This Court is empowered to, and should, grant

9    preliminary and permanent injunctive relief against such acts and practices.

10        93.    Defendant's conduct as alleged in this Complaint is "unlawful" in that it

11   violates California Insurance Code §12760.

12        94.    Defendant's conduct as alleged in this complaint is "unfair" in that it

13   constitutes an unfair business practice as defined by the UCL and applicable caselaw.

14        95.    Defendant's conduct as alleged herein is "fraudulent" in that it is likely to

15   deceive Plaintiff, the Subclass, and the public.  Because Defendants did not disclose

16   the payments they were making to real estate agents, Plaintiff and the Subclass were

17   not provided with full information about the services being provided by Defendants.

18        96.    As a result of Defendant's unlawful, unfair, and fraudulent business

19   practices, Plaintiff was injured.

20        97.    Plaintiff, on behalf of himself and the Subclass, seeks restitution from

21   Defendant FNHW and declaratory and injunctive relief.

**SECOND CAUSE OF ACTION**

**(Violation of Bus. & Prof. Code § 17200 – On Behalf of**

**Plaintiff and the Class Against All Defendants)**

25        98.    Plaintiff repeats and realleges the allegations contained above as if fully

26   stated herein.

27        99.    The Unfair Trade Practices Act defines unfair competition to include any

28   "unfair," "unlawful," or "fraudulent" business act or practice.  Cal. Bus. & Prof. Code

§ 17200. Unfair competition also includes "unfair, deceptive, untrue or misleading advertising." *Id.* The Act also provides for injunctive relief and restitution for violations. *Id.* § 17203.

100.    This cause of action is brought on behalf of Plaintiff, members of the Class, and members of the general public pursuant to California Business & Professions Code sections 17200 et seq. Under Business & Professions Code § 17200 et seq., Plaintiff is entitled to enjoin Defendants' wrongful practices and to obtain restitution for the monies obtained by Defendants by reason of Defendants' unlawful, unfair, and/or deceptive acts and practices.

101.    As a direct and proximate result of the acts and practices alleged above, members of the Class and the general public have been injured, harmed, and/or threatened with harm. This Court is empowered to, and should, order restitution to all persons from whom Defendants may have unfairly and/or unlawfully obtained money and property.

102.    Defendants' unlawful, unfair, and fraudulent business acts and practices, as described above, present a continuing threat to members of the Class and of the general public, in that Defendants are continuing, and will continue, unless enjoined, to commit violations of RESPA and Business & Professions Code § 17200. This Court is empowered to, and should, grant preliminary and permanent injunctive relief against such acts and practices.

103.    Defendants' conduct as alleged in this Complaint is "unlawful" in that it violates RESPA and Cal. Ins. Code Section 12760.

104.    Defendant's conduct as alleged in this complaint is "unfair" in that it constitutes an unfair business practice as defined by the UCL and applicable caselaw.

105.    As a result of Defendants' unlawful and unfair business practices, Plaintiff was injured.

106.    Plaintiff, on behalf of himself and the Class, seeks (1) restitution from Defendants; (2) declaratory relief in the form of a declaration and/or declaratory

-32-

1  judgment that Defendants' conduct violates RESPA, Cal. Ins. Code Section 12760,
2  and California Bus. & Prof. Code Section 17200 et seq.; and (3) injunctive relief in
3  the form of a preliminary and final injunction barring Defendants from engaging in
4  further violations of the law.

### THIRD CAUSE OF ACTION

### (Violation of RESPA, 12 U.S.C. § 2607– On Behalf of
### Plaintiff and the Class Against All Defendants)

8  107.  Plaintiff repeats and realleges the allegations contained above as if fully
9  stated herein.

10  108.  Defendants violated numerous provisions of the Real Estate Settlement
11  Procedures Act, 12 U.S.C. §2601 et seq., as well as Regulations for Real Estate
12  Settlement Procedures, known as Regulation X, promulgated by the Department of
13  Housing and Urban Development, 24 C.F.R. §§3500 et seq.  Specifically, Defendants
14  systematically and repeatedly violated 12 U.S.C. §2607 and 24 C.F.R. §3500.14.

15  109.  Defendants violated RESPA and Regulation X by paying real estate
16  agents kickbacks for the referral of real estate settlement services, as alleged herein, in
17  violation of 12 U.S.C. §2607(a) and 24 C.F.R. §3500.14(b).

18  110.  Plaintiff seeks an order enjoining Defendants from continuing violations
19  of RESPA.  Plaintiff and the Class also seek treble damages under 12 U.S.C.
20  §2607(d)(5).

### FOURTH CAUSE OF ACTION

### Against All Defendants for a Declaratory Judgment
### under 28 U.S.C. § 2201(a) and An Injunction

24  111.  Plaintiff incorporates each allegation stated above, as if fully set forth in
25  this count.

26  112.  The Defendants have a duty to comply with RESPA, Cal. Ins. Code
27  Section 12760, and California Bus. & Prof. Code Section 17200 et seq.

28

-33-
CLASS ACTION COMPLAINT

113.   An actual and substantial controversy exists between Plaintiff and Defendants since Defendants deny that their conduct violates RESPA, Cal. Ins. Code Section 12760, and California Bus. & Prof. Code Section 17200 et seq.

114.   The Defendants have violated and continue to violate RESPA, Cal. Ins. Code Section 12760, and California Bus. & Prof. Code Section 17200 et seq. by the conduct alleged herein.

115.   As a direct and proximate result of the Defendants' violation of RESPA, Cal. Ins. Code Section 12760, and California Bus. & Prof. Code Section 17200 et seq., Plaintiff has been injured.  Moreover, the general public is threatened with harm.

116.   Plaintiff seeks (a) a declaratory judgment that the Defendants' conduct violates RESPA, Cal. Ins. Code Section 12760, and/or California Bus. & Prof. Code Section 17200 et seq. and (b) an injunction that bars the Defendants from further violating such laws.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendant as follows:

A.   A declaration that this action is a proper class action under Federal Rule of Civil Procedure 23 on behalf of the Class and the Subclass, as defined herein, and an order directing that reasonable notice of this action be given to each member of the Class and Subclass;

B.   A declaratory judgment that the Defendants' conduct alleged herein constitutes a violation of RESPA and Regulation X, a violation of Cal. Ins. Code Section 12760, and a violation of the Business & Professions Code § 17200;

C.   An injunction enjoining, preliminarily and permanently, Defendants from continuing the unlawful conduct alleged herein;

D.   For restitution to Plaintiff and each member of the Class, and Subclass, as his or her interest may appear, of all sums unlawfully collected by

1    Defendant from the Plaintiff and other members of the Class and

2    Subclass during the Class Period;

3    E.    For treble damages for the RESPA violations;

4    F.    An award for Plaintiff and the Class for the costs of this suit (including

5    expert fees), and reasonable attorneys' fees, as provided by law; and

6    G.    An award for such other and further relief as the nature of this case may

7    require or as this court deems just, equitable, and proper.

8    **JURY DEMAND**

9    Plaintiff demands a jury trial of all triable issues.

10

11    DATED:  November 23, 2011                CHAPIN FITZGERALD
                                              SULLIVAN & BOTTINI, LLP
12

13                                            _____
14                                            FRANCIS A. BOTTINI, JR.

15                                            Edward D. Chapin, Esq. (SBN: 053287)
                                              Francis A. Bottini, Esq. (SBN: 175783)
16                                            Jill S. Sullivan, Esq. (SBN: 185757)
                                              Jennifer M. Chapman, Esq. (SBN:
17                                            253065)
                                              550 West "C" Street, Suite 2000
18                                            San Diego, California  92101
                                              Tel:  (619) 241-4810
19                                            Fax: (619) 955-5318
20
                                              Counsel for Plaintiff
21

22

23

24

25

26

27

28

-35-

CLASS ACTION COMPLAINT

# EXHIBIT 1

Dated: June 16, 2010.

**Deborah S. Merkle,**
*Chairman.*

[FR Doc. 2010–15317 Filed 6–24–10; 8:45 am]

**BILLING CODE P**

---

## DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

**24 CFR Part 3500**

**[Docket No. FR–5425–IA–01]**

### Real Estate Settlement Procedures Act (RESPA): Home Warranty Companies' Payments to Real Estate Brokers and Agents

**AGENCY:** Office of General Counsel, HUD.

**ACTION:** Interpretive rule.

**SUMMARY:** Under section 8 of RESPA and HUD's implementing RESPA regulations, services performed by real estate brokers and agents as additional settlement services in a real estate transaction are compensable if the services are actual, necessary and distinct from the primary services provided by the real estate broker or agent, the services are not nominal, and the payment is not a duplicative charge. A referral is not a compensable service for which a broker or agent may receive compensation. This rule interprets section 8 of RESPA and HUD's regulations as they apply to the compensation provided by home warranty companies to real estate brokers and agents. Although interpretive rules are exempt from public comment under the Administrative Procedure Act, HUD nevertheless welcomes public comment on this interpretation.

**DATES:** *Effective date:* June 25, 2010. *Comment Due Date:* July 26, 2010.

**ADDRESSES:** Interested persons are invited to submit comments regarding this interpretive rule to the Regulations Division, Office of General Counsel, 451 7th Street, SW., Room 10276, Department of Housing and Urban Development, Washington, DC 20410–0500. Communications must refer to the above docket number and title. There are two methods for submitting public comments. All submissions must refer to the above docket number and title.

1. *Submission of Comments by Mail.* Comments may be submitted by mail to the Regulations Division, Office of General Counsel, Department of Housing and Urban Development, 451 7th Street, SW., Room 10276, Washington, DC 20410–0500.

2. *Electronic Submission of Comments.* Interested persons may

submit comments electronically through the Federal eRulemaking Portal at *www.regulations.gov.* HUD strongly encourages commenters to submit comments electronically. Electronic submission of comments allows the commenter maximum time to prepare and submit a comment, ensures timely receipt by HUD, and enables HUD to make them immediately available to the public. Comments submitted electronically through the *www.regulations.gov* Web site can be viewed by other commenters and interested members of the public. Commenters should follow the instructions provided on that site to submit comments electronically.

**Note:** To receive consideration as public comments, comments must be submitted through one of the two methods specified above. Again, all submissions must refer to the docket number and title of the rule

*No Facsimile Comments.* Facsimile (FAX) comments are not acceptable.

Public Inspection of Public Comments. All properly submitted comments and communications submitted to HUD will be available for public inspection and copying between 8 a.m. and 5 p.m. weekdays at the above address. Due to security measures at the HUD Headquarters building, an advance appointment to review the public comments must be scheduled by calling the Regulations Division at 202–708–3055 (this is not a toll-free number). Individuals with speech or hearing impairments may access this number through TTY by calling the toll-free Federal Information Relay Service at 800–877–8339. Copies of all comments submitted are available for inspection and downloading at *http://www.regulations.gov.*

**FOR FURTHER INFORMATION CONTACT:** For legal questions, contact Paul S. Ceja, Assistant General Counsel for RESPA/SAFE, telephone number 202–708–3137; or Peter S. Race, Assistant General Counsel for Compliance, telephone number 202–708–2350; Department of Housing and Urban Development, 451 7th Street, SW., Room 9262, Washington, DC 20410. For other questions, contact Barton Shapiro, Director, or Mary Jo Sullivan, Deputy Director, Office of RESPA and Interstate Land Sales, Office of Housing, Department of Housing and Urban Development, 451 7th Street, SW., Room 9158, Washington, DC 20410; telephone number 202–708–0502. These telephone numbers are not toll-free. Persons with hearing or speech impairments may access this number via TTY by calling the toll-free Federal

Information Relay Service at 1–800–877–8339.

**SUPPLEMENTARY INFORMATION:**

### I. Background

A homeowner's warranty is covered as a "settlement service" under HUD's RESPA regulations at 24 CFR 3500.2. Accordingly, the framework for compensation of real estate brokers and agents for services performed on behalf of home warranty companies (HWCs) is established in RESPA and HUD's regulations, as discussed in an unofficial staff interpretation letter dated February 21, 2008, issued by the Office of General Counsel. In brief, services performed by real estate brokers and agents on behalf of HWCs are compensable as additional settlement services if the services are actual, necessary and distinct from the primary services provided by the real estate broker or agent. (*See* 24 CFR 3500.14(g)(3).) The real estate broker or agent may accept a portion of the charge for the homeowner warranty only if the broker or agent provides services that are not nominal and for which there is not a duplicative charge. (*See* 24 CFR 3500.14(c).)

HUD has received inquiries regarding the application of this framework to the compensation provided by HWCs to real estate brokers and agents for the selling of home warranties in connection with the sale or purchase of a home. In particular, interested parties have inquired about the legality of the HWCs providing compensation to real estate brokers and agents on a per transaction basis and about the scope of services provided on behalf of the HWC for which real estate brokers and agents can be compensated by the HWC.

### II. This Interpretive Rule

This interpretive rule clarifies the legality under section 8 of RESPA and HUD's implementing regulations of the compensation provided by HWCs to real estate brokers and agents, and it is provided in accordance with Secretary of HUD's delegation of authority to the General Counsel to interpret the authority of the Secretary. (*See* 74 FR 62801, at 62802.)

*A. Unlawful Compensation for Referrals*

RESPA does not prohibit a real estate broker or agent from referring business to an HWC. Rather, RESPA prohibits a real estate broker or agent from receiving a fee for such a referral, as a referral is not a compensable service. (*See* 24 CFR 3500.14(b).) HUD's regulations, at 24 CFR 3500.14(f), defines referral, in relevant part, as follows:

A referral includes any oral or written action directed to a person which has the effect of *affirmatively influencing the selection by any person of a provider of a settlement service* or business incident to or part of a settlement service when such person will pay for such settlement service or business incident thereto or pay a charge attributable in whole or in part to such settlement service or business. (Emphasis added.)

To evaluate whether a payment from an HWC is an unlawful kickback for a referral, HUD may look in the first instance to whether, among other things:

• The compensation for the HWC services provided by the real estate broker or agent is contingent on an arrangement that prohibits the real estate broker or agent from performing services for other HWC companies; *e.g.* if a real estate broker or agent is compensated for performing HWC services for only one company, this is evidence that the compensation may be contingent on such an arrangements; and

• Payments to real estate brokers or agents by the HWC are based on, or adjusted in future agreements according to, the number of transactions referred.

If it is subsequently determined, however, that the payment at issue is for only compensable services,[1] the existence of such arrangements and agreements would not be an indicator of an unlawful referral arrangement, and would be permissible. (*See* discussion in Sections C and D below.)

*B. Marketing by a Real Estate Broker or Agent Directed to Particular Homebuyers or Sellers*

In some circumstances, marketing services performed on behalf of an HWC are not compensable services. In particular, a real estate broker or agent is in a unique position to refer settlement service business and through marketing can affirmatively influence a homebuyer's or seller's selection of an HWC. As a real estate broker and agent hold positions of influence in the real estate transaction, a homebuyer or seller is more likely to accept the broker's or agent's promotion or recommendation of a settlement service provider. Therefore, marketing performed by a real estate broker or agent on behalf of an HWC to sell a homeowner warranty to particular homebuyers or sellers is a "referral" to a settlement service provider.

Accordingly, in a transaction involving a federally related mortgage loan, an HWC's compensation of a real estate broker or agent for marketing services that are directed to particular homebuyers or sellers would be a payment that violates section 8 of RESPA as an illegal kickback for a referral of settlement service business. For example, a real estate broker or agent actively promoting an HWC and its products to sellers or prospective homebuyers by providing HWC verbal "sales pitches" about the benefits of a particular HWC product or by distributing the HWC's promotional material at the broker's or agent's office or at an open house is considered to be a referral. Thus, compensating the real estate broker or agent for such promotion would result in a violation of section 8 of RESPA.

Nothing precludes a real estate broker or agent from performing services to aid the seller or buyer, or to increase the possibility that the real estate transaction will occur and thereby benefit the broker or agent. However, the broker or agent may not be compensated by the HWC for marketing services directed to particular homebuyers or sellers.

*C. Bona Fide Compensation for Services Performed*

Section 8(c) of RESPA and HUD's regulations allow payment of bona fide compensation for services actually performed. (*See* 24 CFR 3500.14(g)(1)(iv).) HUD's regulations also allow persons in a position to refer settlement service business to receive payments for providing additional compensable services as part of a transaction. (*See* 24 CFR 3500.14(g)(3).) Services performed by real estate brokers and agents on behalf of HWCs would be compensable as additional settlement services only if the services are actual, necessary and distinct from the primary services provided by the real estate broker or agent. Further, the real estate broker or agent may accept, and an HWC may pay to the broker or agent, a portion of the charge for the homeowner warranty only for services that are not nominal and for which there is not a duplicative charge. (*See* 24 CFR 3500.14(c).) HUD looks at the actual services provided to determine in a particular case whether compensable services have been performed by the real estate broker or agent.[2]

A determination that compensable services have been performed by the real estate broker or agent will be based on a review of the particular facts of each case. Evidence in support of such a determination may include:

• Services—other than referrals—to be performed are specified in a contract between the HWC and the real estate broker or agent, and the real estate broker or agent has documented the services provided to the HWC;

• The services actually performed are not duplicative of those typically provided by a real estate broker or agent;

• The real estate broker or agent is by contract the legal agent of the HWC, and the HWC assumes responsibility for any representations made by the broker or agent about the warranty product; and

• The real estate broker or agent has fully disclosed to the consumer the compensable services that will be provided and the compensation arrangement with the HWC, and has made clear that the consumer may purchase a home warranty from other vendors or may choose not to purchase any home warranty.

HUD will review evidence on a case-by-case basis to determine whether compensation provided was a kickback for a referral or a legal payment for the compensable services. If it is factually determined that only actual compensable services have been performed by a real estate broker or agent in a transaction, it follows that transaction-based compensation of that broker or agent that is reasonable would not be an indicator of an unlawful referral arrangement and would be permissible.

*Reasonableness of Compensation*

As the final step in assessing the legality of the compensation for these services, HUD will also assess whether the value of the payment by the HWC is reasonably related to the value of the services actually performed by the real estate broker or agent. In the context of loan origination, for example, HUD has stated that the mere taking of an application is not sufficient work to justify a fee under RESPA. In its Statement of Policy 1999–1, entitled "Regarding Lender Payments to Mortgage Brokers" (64 FR 10080, March 1, 1999), HUD stated:

Although RESPA is not a rate-making statute, HUD is authorized to ensure that payments from lenders to mortgage brokers are reasonably related to the value of the goods or facilities actually furnished, and are not

---

[1] Compensable services are services that are actual, necessary and distinct from the primary services provided by the real estate broker or agent, that are not nominal, and for which duplicative fees are not charged.

[2] For example, conducting actual inspections of the items to be covered by the warranty to identify pre-existing conditions that could affect home warranty coverage, recording serial numbers of the items to be covered, documenting the condition of the covered items by taking pictures and reporting to the HWC regarding inspections may be compensable services.

**Federal Register** / Vol. 75, No. 122 / Friday, June 25, 2010 / Rules and Regulations　　**36273**

compensation for the referrals of business, splits of fees or unearned fees.

In analyzing whether a particular payment or fee bears a reasonable relationship to the value of the goods or facilities actually furnished or services actually performed, HUD believes that payments must be commensurate with that amount normally charged for similar services, goods or facilities * * *. If the payment or a portion thereof bears no reasonable relationship to the market value of the goods, facilities or services provided, the excess over the market rate may be used as evidence of a compensated referral or an unearned fee in violation of Section 8(a) or (b) of RESPA. (*See* 24 CFR 3500.14(g)(2).) Moreover, HUD also believes that the market price used to determine whether a particular payment meets the reasonableness test may not include a referral fee or unearned fee, because such fees are prohibited by RESPA. Congress was clear that for payments to be legal under Section 8, they must bear a reasonable relationship to the value received by the person or company making the payment. (S. Rep. 93–866, at 6551.) 64 FR 10086.

*D. Conclusion*

Accordingly, HUD interprets section 8 of RESPA and HUD's regulations as these authorities apply to the compensation provided by home warranty companies to real estate brokers and agents as follows:

(1) A payment by an HWC for marketing services performed by real estate brokers or agents on behalf of the HWC that are directed to particular homebuyers or sellers is an illegal kickback for a referral under section 8;

(2) Depending upon the facts of a particular case, an HWC may compensate a real estate broker or agent for services when those services are actual, necessary and distinct from the primary services provided by the real estate broker or agent, and when those additional services are not nominal and are not services for which there is a duplicative charge; and

(3) The amount of compensation from the HWC that is permitted under section 8 for such additional services must be reasonably related to the value of those services and not include compensation for referrals of business.

*F. Solicitation of Comment*

This interpretive rule represents HUD's interpretation of its existing regulations and is exempt from the notice and comment requirements of the Administrative Procedure Act. (*See* 5 USC 553(b)(3)(A).) Nevertheless, HUD is interested in receiving feedback from the public on this interpretation, specifically with respect to clarity and scope.

Dated: June 18, 2010.
**Helen R. Kanovsky,**
*General Counsel.*
[FR Doc. 2010–15355 Filed 6–24–10; 8:45 am]
**BILLING CODE 4210–67–P**

---

**DEPARTMENT OF HOMELAND SECURITY**

**Coast Guard**

**33 CFR Parts 1, 3, 8, 13, 19, 23, 25, 26, 27, 51, 67, 81, 84, 89, 96, 101, 104, 105, 110, 114, 116, 118, 120, 126, 127, 128, 135, 140, 141, 144, 148, 149, 150, 151, 153, 154, 155, 156, 157, 158, 159, 160, 164, 165, 167, 169, 174, 179, 181, and 183**

**[Docket No. USCG–2010–0351]**

**RIN 1625–ZA25**

**Navigation and Navigable Waters; Technical, Organizational, and Conforming Amendments**

**AGENCY:** Coast Guard, DHS.
**ACTION:** Final rule.

**SUMMARY:** This rule makes non-substantive changes throughout Title 33 of the Code of Federal Regulations. The purpose of this rule is to make conforming amendments and technical corrections to Coast Guard navigation and navigable waters regulations. This rule will have no substantive effect on the regulated public. These changes are provided to coincide with the annual recodification of Title 33 on July 1.
**DATES:** This final rule is effective June 25, 2010.
**ADDRESSES:** Comments and material received from the public, as well as documents mentioned in this preamble as being available in the docket, are part of docket USCG–2010–0351 and are available for inspection or copying at the Docket Management Facility (M–30), U.S. Department of Transportation, West Building Ground Floor, Room W12–140, 1200 New Jersey Avenue, SE., Washington, DC 20590, between 9 a.m. and 5 p.m., Monday through Friday, except Federal holidays. You may also find this docket on the Internet by going to *http://www.regulations.gov*, inserting USCG–2010–0351 in the "Keyword" box, and then clicking "Search."
**FOR FURTHER INFORMATION CONTACT:** If you have questions on this rule, call or e-mail Diane LaCumsky, Coast Guard; telephone 202–372–1025, e-mail *Diane.M.LaCumsky@uscg.mil*. If you have questions on viewing the docket, call Renee V. Wright, Program Manager, Docket Operations, telephone 202–366–9826.

**SUPPLEMENTARY INFORMATION:**

**Table of Contents for Preamble**

I. Regulatory History
II. Background
III. Discussion of Rule
IV. Regulatory Analyses
　A. Regulatory Planning and Review
　B. Small Entities
　C. Collection of Information
　D. Federalism
　E. Unfunded Mandates Reform Act
　F. Taking of Private Property
　G. Civil Justice Reform
　H. Protection of Children
　I. Indian Tribal Governments
　J. Energy Effects
　K. Technical Standards
　L. Environment

**I. Regulatory History**

We did not publish a notice of proposed rulemaking (NPRM) for this rule. Under 5 U.S.C. 553(b)(3)(A), the Coast Guard finds this rule is exempt from notice and comment rulemaking requirements because these changes involve rules of agency organization, procedure, or practice. In addition, the Coast Guard finds notice and comment procedure are unnecessary under 5 U.S.C. 553 (b)(3)(B) as this rule consists only of corrections and editorial, organizational, and conforming amendments and these changes will have no substantive effect on the public. This rulemaking also implements the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, by revising the Penalty Adjustment Table published in 33 CFR 27.3. This revision reflects statutorily prescribed adjustments of civil monetary penalties (CMP) for 2010. These statutes do not allow for discretion in implementation, rendering prior notice and comment unnecessary and contrary to the public interest.

Under 5 U.S.C. 553(d)(3), the Coast Guard finds that, for the same reasons, good cause exists for making this rule effective upon publication in the **Federal Register.**

**II. Background**

Each year the printed edition of Title 33 of the Code of Federal Regulations is recodified on July 1. This rule, which becomes effective June 25, 2010, makes technical and editorial corrections throughout Title 33 in time to be reflected in the recodification. This rule does not create any substantive requirements.

**III. Discussion of Rule**

This rule amends 33 CFR Part 1 by adding a new paragraph to clarify the Coast Guard's District Commanders' authority to redelegate signature of

# EXHIBIT 2

**DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**

**24 CFR Part 3500**

**[Docket No. FR–5425–IA–02]**

**Real Estate Settlement Procedures Act (RESPA): Home Warranty Companies' Payments
to Real Estate Brokers and Agents
Interpretive Rule: Response to Public Comments**

**AGENCY:** Office of General Counsel, HUD.

**ACTION:** Interpretive Rule; Response to Public Comments.

**SUMMARY:** On June 25, 2010, HUD issued a rule interpreting certain provisions of RESPA as

applied to the payment of fees to real estate brokers and agents by home warranty companies.

The public was invited to comment on the interpretive rule. After reviewing and considering the

comments, HUD determined that changes are not needed to the interpretive rule. Through this

document, HUD responds to certain questions raised in the comments. HUD believes that its

response to these questions serves to provide additional guidance relating to matters covered in

the interpretive rule and the comments.

**FOR FURTHER INFORMATION CONTACT:** For legal questions, contact Paul S. Ceja,

Assistant General Counsel for RESPA/SAFE, telephone number 202-708-3137; or Peter S. Race,

Assistant General Counsel for Compliance, telephone number 202-708-2350; Department of

Housing and Urban Development, 451 7th Street, SW, Room 9262, Washington, DC 20410. For

other questions, contact Barton Shapiro, Director, or Mary Jo Sullivan, Deputy Director, Office

of RESPA and Interstate Land Sales, Office of Housing, Department of Housing and Urban

Development, 451 7th Street, SW, Room 9158, Washington, DC 20410; telephone number 202–

708–0502. These telephone numbers are not toll-free. Persons with hearing or speech

impairments may access these numbers via TTY by calling the toll-free Federal Information Relay Service at 1-800-877-8339.

**SUPPLEMENTARY INFORMATION:**

**I. Background**

      The requirements and prohibitions under RESPA apply to residential real estate transactions that include a federally related mortgage loan. Section 8 of RESPA prohibits giving and receiving "kickbacks" for the referral of real estate settlement services, and unearned fees, involving real estate transactions. Since 1992, HUD's RESPA regulations have defined "settlement service" to include "homeowner's warranties". 24 CFR 3500.2(11). While a referral of settlement services is not compensable under RESPA, a real estate broker or agent (or other person in a position to refer settlement service business) may be compensated for services that are actual, necessary and distinct from the primary services provided by the real estate broker or agent, if the services are not nominal, and the payment is not a duplicative charge. (See 24 CFR 3500.14(b), (c), (g)(1), and (g)(3)).

      On June 25, 2010 (75 FR 36271), HUD issued an interpretive rule on the propriety under Section 8 of RESPA (12 U.S.C. § 2607) of payments to real estate brokers and agents from home warranty companies (HWCs). The interpretive rule concluded:

      (1) A payment by an HWC for marketing services performed by real estate brokers or agents on behalf of the HWC that are directed to particular homebuyers or sellers is an illegal kickback for a referral under section 8;

      (2) Depending upon the facts of a particular case, an HWC may compensate a real estate broker or agent for services when those services are actual, necessary and distinct from the primary services provided by the real estate broker or agent, and when those

additional services are not nominal and are not services for which there is a duplicative

charge; and

(3) The amount of compensation from the HWC that is permitted under section 8 for such

additional services must be reasonably related to the value of those services and not

include compensation for referrals of business.

75 FR at 36273.

HUD received 72 comments in response to publication of the interpretive rule. HUD

reviewed all of the comments, and appreciates the input and information provided by the

commenters. Some commenters supported the interpretive rule and others did not. HUD found

that the comments that were not supportive of its interpretation did not present concerns or

information that warrant any changes to the interpretive rule. HUD, however, has identified and

is responding to seven specific questions to provide additional guidance relating to matters

covered in the interpretive rule and the comments.

**II. Questions and Responses**

1. Question:  Is a home warranty company's flat fee payment (e.g., monthly or annual

payment) to a real estate broker or agent for marketing a home warranty product directly to

particular homebuyers or sellers a permissible payment under section 8 of RESPA?

HUD Response:  No, as provided in the interpretive rule, payments for marketing

services directed to particular homebuyers or sellers are considered to be payments for

affirmatively influencing their choice of settlement service providers and would therefore violate

section 8 of RESPA as an illegal kickback for a referral, regardless of whether the payment is

made to the broker or agent on a "per transaction" or a "flat fee" basis.

2. <u>Question</u>:  Is the list of items in footnote 2 of the interpretive rule an exhaustive list of

the services that a real estate broker or agent can be legally compensated for by a home warranty

company under section 8 of RESPA?

<u>HUD Response</u>:  No, the footnote itself begins with the introduction, "For example".

The list in the footnote is not exhaustive but exemplary of services that, in a particular case, may

be compensable.  However, as discussed in the interpretive rule, to be compensable the services

must be services that are "actual, necessary and distinct from the primary services provided by

the real estate broker or agent, that are not nominal, and for which duplicative fees are not

charged" (see fn.1 of the interpretive rule).  Referrals of settlement service business are not

compensable services.  Therefore, payments made for "services" that were fabricated to disguise

a payment to a real estate broker or agent for referrals and are not, in fact, "necessary" would be

illegal under section 8 of RESPA.

3. <u>Question</u>:  What is meant by the statement in the interpretive rule that evidence in

support of a determination that compensable services have been performed by a real estate

broker or agent may include: "The real estate broker or agent is by contract the legal agent of the

HWC, and the HWC assumes responsibility for any representations made by the broker or agent

about the warranty product."

<u>HUD Response</u>:  While not conclusive, the fact that a home warranty company is willing

to be legally committed by the work and representations of a real estate broker or agent who is

compensated by the HWC for performing services is one indicator that those services provided

are "actual, necessary and distinct" and not nominal—i.e., that actual work is being performed by

the real estate broker or agent for which the home warranty company is willing to assume

liability.  Specifically, such a legal relationship indicates that the HWC has worked with the real

estate broker or agent closely enough to understand the value of the services performed by the broker or agent, and to be confident enough of the broker's or agent's services and representations, that the HWC is willing to take responsibility for those services and representations. Conversely however, if in a contract with a consumer, for example, the HWC disclaims liability for acts and representations of the real estate broker or agent in connection with the home warranty, this may indicate that no actual services of value have been performed by the real estate broker or agent.

4. Question:  Why is it a relevant factor in analyzing a potential section 8 violation that a home warranty company's payment to a real estate broker or agent was made under an exclusive-representation arrangement?

HUD Response:  Section 8 of RESPA prohibits payments for referrals and unearned fees. Stated another way, referrals are not compensable services under section 8.  See 24 CFR 3500.14(b).  HUD's interpretive rule states that, in initially evaluating whether a payment from an HWC to a real estate broker or agent is a violation of section 8, HUD may look at whether the payment is tied to an arrangement that prohibits the broker or agent from receiving from a competitor comparable payment for comparable actual services.  In other words, such an exclusive-representation arrangement between the HWC and the real estate broker or agent is evidence of an unlawful-payment-for-referral arrangement whereby the real estate broker or agent is only being paid for steering customers exclusively to the HWC and its products. However, as it is further noted in the interpretive rule, if it is determined that the HWC's payment is only for compensable services, the existence of an exclusive-representation arrangement would be permissible under section 8.

5. Question: Does the interpretive rule prohibit payments from an HWC to real estate brokers or agents for general advertising services performed by the brokers or agents on behalf of the HWC?

HUD Response: No. The interpretive rule specifically prohibits compensation for marketing performed by a real estate broker or agent on behalf of an HWC when the marketing is directed to selling the HWC's home warranty product to particular homebuyers or sellers. HUD would evaluate the permissibility of compensation provided by an HWC to real estate brokers or agents for other advertising by applying the definition of "referral" in § 3500.14(f) of HUD's RESPA regulations. For example, a reasonable payment for an advertisement by an HWC in a real estate broker's or agent's publication or on the broker's or agent's website would not, in and of itself, be a payment for a referral under RESPA. If the marketing services for which the HWC is paying the real estate broker or agent are services directed to a homebuyer or seller that have the effect of "affirmatively influencing" the selection by the homebuyer or seller of the HWC's home warranty product in connection with the real estate settlement, then those marketing services would be subject to RESPA's prohibitions on referral payments.

6. Question: Is a home warranty always considered to be a "settlement service" for purposes of RESPA coverage?

HUD Response: No. RESPA's kickback and referral fee prohibitions are applicable in the context of "settlement services", a term that is defined broadly under RESPA and HUD's RESPA regulations. RESPA defines "settlement services" to include "any service provided in connection with a real estate settlement" and provides a nonexclusive listing of such services (12 U.S.C. § 2602(3)). In its regulations HUD has long defined "settlement service" to include "any service provided in connection with a prospective or actual settlement..." (24 CFR 3500.2). As

noted above and in the interpretive rule, "homeowner's warranties" have been specifically

included in HUD's definition of "settlement service" since 1992 (24 CFR 3500.2(11)).

Therefore, when a home warranty is "provided in connection with a prospective or actual

settlement", it is a "settlement service" under HUD's regulatory interpretation of RESPA.

In determining whether services involving a home warranty are provided in connection

with a prospective or actual settlement, HUD would consider, among other things: (i) whether

the charge for the home warranty is paid out of the proceeds at the settlement; and (ii) if the

charge is not paid at settlement, whether the timing of the purchase of and payment for the home

warranty indicates that the purchase is so removed from the settlement that it is not provided "in

connection with" a settlement within the meaning of RESPA and HUD's regulations.  Items paid

in connection with a RESPA-covered transaction, of course, may be paid and disclosed on the

HUD-1/1A settlement statement as paid outside of closing (P.O.C.) or through the accounting at

settlement.

7. Question:  Does the interpretive rule apply to situations beyond home warranty

company payments to real estate brokers and agents, for example to payments by other

settlement service providers to real estate brokers and agents?

HUD Response:  The interpretive rule is specifically directed to home warranty company

payments to real estate brokers and agents.  However, the analysis in the interpretive rule is

based on an interpretation of the RESPA statute and HUD's existing regulations, which analysis

may be applicable to payments made by other settlement service providers to real estate brokers

or agents.

### III. Confirmation of June 25, 2010, Interpretive Rule

Again, HUD appreciates the input and information provided by the members of the public and representatives of industry who responded to HUD's solicitation of public comment on the June 25, 2010, interpretive rule. After consideration of the comments, HUD confirms its June 25, 2010, interpretation of certain provisions of RESPA as applied to the payment of fees to real estate brokers and agents by home warranty companies. The interpretive rule therefore stands without change.

Finally, some commenters asked whether the interpretive rule has prospective or retroactive effect. An interpretive rule does not change existing law. As noted in the concluding paragraph of the rule, the interpretive rule represents HUD's interpretation of its existing regulations. This interpretive rule, therefore, does not constitute a change in HUD's interpretation of RESPA or the RESPA regulations, but is an articulation of HUD's interpretation of RESPA and the implementing regulations that specifically applies to home warranty company payments to real estate brokers and agents.

Authority: 12 USC 2601-2617; 42 USC 3535(d).

Dated:   November 23, 2010

Helen R. Kanovsky, General Counsel

Name & Address:
Edward D. Chapin, Esq. (SBN: 053287)
Francis A. Bottini, Jr., Esq. (SBN: 175783)
Chapin Fitzgerald Sullivan & Bottini LLP
550 West C Street, Suite 2000
San Diego, CA 92101

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PAUL PRESTON, on behalf of himself and all others similarly situated,<br><br><br>PLAINTIFF(S) | CASE NUMBER<br><br>**CV11-09746 DSF (AGRx)** |
| v. | |
| FIDELITY NATIONAL FINANCIAL, INC., a Delaware corporation;<br>[see attachment]<br><br>DEFENDANT(S). | **SUMMONS** |

TO:    DEFENDANT(S):

A lawsuit has been filed against you.

Within __21__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff's attorney, _Francis A. Bottini, Jr., Esq._____, whose address is _550 West C Street, Suite 2000, San Diego, CA 92101_____. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated: **November 23, 2011**

By: _____
AMY DeAVILA
Deputy Clerk

(Seal of the Court)

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*

## ATTACHMENT TO SUMMONS

PAUL PRESTON, on behalf of himself
and all others similarly situated,

      Plaintiff,

vs.

FIDELITY NATIONAL FINANCIAL, INC.,
a Delaware corporation,
FIDELITY NATIONAL HOME
WARRANTY COMPANY,
a California corporation,
FIDELITY NATIONAL TITLE
INSURANCE COMPANY,
a California corporation,
LAWYERS TITLE COMPANY,
a California corporation,
COMMONWEALTH LAND TITLE
COMPANY, a California corporation,
TICOR TITLE COMPANY OF CALIFORNIA,
a California corporation,
CHICAGO TITLE COMPANY,
a California corporation,

      Defendants

COPY

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself ☐) PAUL PRESTON, on behalf of himself and all others similarly situated, | DEFENDANTS FIDELITY NATIONAL FINANCIAL, INC., a Delaware corporation, FIDELITY NATIONAL HOME WARRANTY COMPANY, a California corporation, FIDELITY NATIONAL TITLE INSURANCE COMPANY et |
|---|---|
| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) Francis A. Bottini, Jr., Esq., CHAPIN FITZGERALD SULLIVAN & BOTTINI 550 West C Street, Suite 2000 San Diego, CA 92101   Tel (619) 241-4810 | Attorneys (If Known) |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff   ☒ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant   ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only (Place an X in one box for plaintiff and one for defendant.)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify):   ☐ 6 Multi-District Litigation   ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT:   JURY DEMAND:** ☒ Yes   ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☒ Yes   ☐ No   ☒ **MONEY DEMANDED IN COMPLAINT: $** according to proof

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
12 U.S.C. SECTION 2601 - Violation of the Real Estate Settlement Procedures Act

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | | ☐ 540 Mandamus/ Other | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 345 Marine Product Liability | **BANKRUPTCY** | ☐ 550 Civil Rights | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 422 Appeal 28 USC 158 | ☐ 555 Prison Condition | **PROPERTY RIGHTS** |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | ☐ 423 Withdrawal 28 USC 157 | **FORFEITURE/ PENALTY** | ☐ 820 Copyrights |
| ☐ 810 Selective Service | | ☐ 360 Other Personal Injury | **CIVIL RIGHTS** | ☐ 610 Agriculture | ☐ 830 Patent |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 362 Personal Injury-Med Malpractice | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 365 Personal Injury-Product Liability | ☐ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | **SOCIAL SECURITY** |
| ☒ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 443 Housing/Acco-mmodations | | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | | ☐ 444 Welfare | ☐ 630 Liquor Laws | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | **REAL PROPERTY** | ☐ 445 American with Disabilities - Employment | ☐ 640 R.R. & Truck | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | **REAL PROPERTY** | ☐ 210 Land Condemnation | ☐ 446 American with Disabilities - Other | ☐ 650 Airline Regs | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 210 Land Condemnation | ☐ 220 Foreclosure | ☐ 440 Other Civil Rights | ☐ 660 Occupational Safety /Health | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 220 Foreclosure | ☐ 230 Rent Lease & Ejectment | **IMMIGRATION** | ☐ 690 Other | **FEDERAL TAX SUITS** |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 230 Rent Lease & Ejectment | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 240 Torts to Land | ☐ 245 Tort Product Liability | ☐ 463 Habeas Corpus-Alien Detainee | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 245 Tort Product Liability | ☐ 290 All Other Real Property | ☐ 465 Other Immigration Actions | | |
| | ☐ 290 All Other Real Property | | | | |

## CV11-09746 DSF (AGRx)

**FOR OFFICE USE ONLY:**   Case Number: _____

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

CV-71 (05/08)

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed?  ☑ No   ☐ Yes
If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case?  ☑ No   ☐ Yes
If yes, list case number(s): _____

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply)   ☐ A.  Arise from the same or closely related transactions, happenings, or events; or
☐ B.  Call for determination of the same or substantially related or similar questions of law and fact; or
☐ C.  For other reasons would entail substantial duplication of labor if heard by different judges; or
☐ D.  Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.
☑   Check here if the government, its agencies or employees is a named plaintiff.  If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| San Bernardino | |

(b)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.
☐   Check here if the government, its agencies or employees is a named defendant.  If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles County, Orange County | |

(c)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
**Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| San Bernardino | |

**\* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
Note: In land condemnation cases, use the location of the tract of land involved

X. SIGNATURE OF ATTORNEY (OR PRO PER): _Mruu a Bot_      Date November 23, 2011

Notice to Counsel/Parties:  The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law.  This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet.  (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program.  (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended.  (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |